UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EKRAM SIDDIQUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-2015 (RMC) |
| | ) | |
| MACY'S, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

Ekram Siddique worked as a sales associate for Hecht's and its successor, Macy's, for many years. In 2009, he was working in Men's Suits at Macy's in downtown D.C. and often arrived for work 15 minutes late because he stayed with his youngest child while his wife took the other children to school. When a new director of human resources came to the store, Mr. Siddique's habitual tardiness became an issue, and Macy's warned him three times that he could no longer be late. Because he believed that he could not change his childcare obligations, Mr. Siddique asked to work a part-time shift in the evening hours. He did not accept either of the two part-time positions Macy's offered him and was separated from employment. Mr. Siddique now sues Macy's, on his own without a lawyer, claiming violations of the D.C. Human Rights Act and the D.C. Family and Medical Leave Act.

**I.  FACTS**

Ekram Siddique is a foreign born citizen of the United States who speaks with an accent that is "noticeably Indian." Compl. [Dkt. 1-1] ¶¶ 2-4. He began working for Hecht's in August 1990 and, in 2006, worked at the Hecht's store in Friendship Heights, Maryland, just

over the line from the District of Columbia. *Id.* ¶¶ 12-13; Resp. to Def. Statement of Undisputed Facts (Resp. to SUF) [Dkt. 28] ¶ 1. After Macy's acquired Hecht's in August 2006, the store in Friendship Heights closed, and Mr. Siddique moved to the Macy's store at Metro Center in downtown D.C. as a sales associate in the Men's Suits Department. Compl. ¶¶ 14-15; Def. Statement of Undisputed Facts (SUF) [Dkt. 23] ¶ 2. Macy's paid him on commission at a rate that averaged approximately $30/hour if paid on an hourly basis. Compl. ¶¶ 17-18; SUF ¶ 3. His performance reviews were excellent and over the course of his career he received numerous awards in recognition of his customer service. *See* Pl. Opp., Ex. 7 (Annual Reviews) [Dkt. 28-1].

Mr. Siddique has four children, born between 2000 and 2007. Compl. ¶ 20. In 2009, the time of the events here, his youngest son was two years old and suffered from medically-diagnosed behavioral problems. Compl. ¶ 21; Resp. to SUF ¶ 9. As a result, Mr. Siddique stayed with his youngest child while his wife took the other three children to school in the morning; this practice made him periodically arrive late for work. Resp. to SUF ¶¶ 6, 9. That is, instead of arriving at 9:30 when sales associates were due to start work, he would arrive closer to 9:45, which was still before the store actually opened at 10:00 A.M. but late to straighten the merchandise for the day. *Id.*

In March 2009, a new human resources (HR) manager, Laura Anninos, arrived and noticed that associates failed to meet their schedules and were not being held accountable; she met with store management to address the problem. Def. Mot. for Summ. J. [Dkt. 23], Ex. 2 (Anninos Decl.) [Dkt. 23-11] ¶ 5. In April 2009, Liz Green, Mr. Siddique's sales manager, verbally warned Mr. Siddique about his tardiness. SUF ¶¶ 7-8. Shortly thereafter, in June and

August 2009, Ms. Green issued Mr. Siddique two written warnings[1] that his habitual tardiness was unacceptable and that it put his job in jeopardy. SUF ¶¶ 9, 11. Mr. Siddique "was tardy 49 times prior to the first warning [Reminder dated June 22, 2009] and tardy an additional 21 times following the first warning." Def. Mot., Ex. 1(G) (Younger Letter) [Dkt. 23-8] ¶ 2. His tardiness continued after the issuance of the second written warning. Younger Decl. ¶ 16. Mr. Siddique insists that he told Ms. Green that he needed a 15-minute grace period because his youngest son was hyperactive, Resp. to SUF ¶ 9, 12, but Macy's disputes that it ever received any information about his son's health status.[2]

---

[1] The two written warnings to Mr. Siddique were called "Reminders" and constituted the first and second step of Macy's progressive discipline policy. Reminder One was issued on June 22, 2009 and stated:

> Performance/conduct expectation(s): Ekram is expected to follow all guidelines in the associate handbook as well as his schedule at all time [sic] including showing up for work on time.
>
> Why this is important: Being to work on time is important so the business can operate in a timely manner so we can give outstanding customer service.
>
> Your performance/conduct is not meeting Macy's expectation(s). Specifically: On 4/11 [sic] had a verbal conversation with Ekram about time & attendance, since then Ekram is excessively tardy.

Def. Mot., Ex. 1 (Younger Decl.) [Dkt. 23-1] ¶ 14; *id.*, Ex. 1(A) (Reminder One) [Dkt. 23-2]. Reminder Two was issued on August 5, 2009. It had the same format. Its third paragraph read: "Your performance/conduct is not meeting Macy's expectation(s). Specifically: On June 22, 2009, we discussed Ekram's tardiness. Since then Ekram has been tardy 8 times. Macy's policy is more than 7 tardies in a 90 day period results in disciplinary actions." Def. Mot., Ex. 1(B) (Reminder Two) [Dkt. 23-3].

[2] Mr. Siddique says, "*I requested that I have four Kids, If possible I can get scheduled at 9:45 a.m. during my kids school time* and I didn't sign[] that document [the Reminder] as I knew that in my department at Men's Suits Mr. Ron Pinto who was suppose[d] to come at 5:45 p.m. and was accommodated to come at 4:30 p.m. and leave early from work on Saturday." Resp. to SUF ¶ 12 (emphasis added). Admittedly, Ms. Anninos did not know of Mr. Pinto's schedule. *Id.*

In early September 2009, Mr. Siddique had an argument with a fellow sales associate during which Mr. Siddique said to him, "we didn't come from the jungle." Resp. to SUF ¶ 14. The other man, a native of Senegal, considered this an insult and reported it to HR. SUF ¶ 14. Mr. Siddique states that his comment has been taken out of context and his statement meant only that he hoped to resolve their dispute amicably.[3] Resp. to SUF ¶¶ 14, 15. Macy's considered it a racially derogatory statement and, coupled with his continued tardiness, decided to issue a "Decision-Making Leave" form to Mr. Siddique on September 11, 2009. The critical third paragraph read:

> Your performance/conduct is not meeting Macy's expectation(s). Specifically: On September 1st you had a conversation with Assane, where you stated "we are not from a jungle." This is an inappropriate way to speak to co-workers. In addition, he has had 5 tardies since his Reminder 2. Ekram must show to work on time and interact with all associates and guest [sic] within the guidelines of outstanding customer service.

Def. Mot., Ex. 1(D) (Decision-Making Leave form) [Dkt. 23-5]. Decision-Making Leave is the final step in Macy's progressive discipline process and calls for an employee to absent himself on his next scheduled shift to decide whether he wants to continue to work for Macy's, *i.e.*, work within its rules and policies. If the employee wants to remain at Macy's, he must then inform Macy's in writing how he plans to commit to meeting Macy's expectations. Younger Decl. ¶¶ 9, 10; Anninos Decl. ¶ 6. "An associate needs to make a written commitment following the Decision-Making Leave in order to work his next shift." Younger Decl. ¶ 10. Mr. Siddique consulted with his Union representatives, in-store Shop Steward Kelly Boddie and Union Representative Diettra Lucas. Mr. Siddique told Ms. Boddie that "he could not commit to arriving at work on time for his full-time schedule because he had to watch his baby while his

---

[3] Mr. Siddique claims that "we didn't come from the jungle" is a common phrase from India that only distinguishes humans from beasts with no racial overtones. Resp. to SUF ¶¶ 14, 15.

4

wife took his other children to the bus stop in the morning." Def. Mot., Ex. 4 (Boddie Decl.) [Dkt. 23-13] ¶ 4.

Mr. Siddique and Ms. Boddie met with Ms. Anninos on September 22, 2009, to discuss Mr. Siddique's commitment in response to the Decision-Making Leave form.  Ms. Boddie and Ms. Anninos both declare that Mr. Siddique never mentioned any medical condition of his youngest child.  Boddie Decl. ¶ 9; Anninos Decl. ¶¶ 12, 13.  Mr. Siddique admits that he "said during the meeting on 22nd September 2009 that It [sic] was not feasible to commit to arriving at work, sometime on time, when Macy's Management . . . denied me 15 minute grace period that I requested *for my for [sic] childcare needs*."  Resp. to SUF ¶ 21 (emphasis added).  Ms. Anninos asked Mr. Siddique for his commitment letter so that he could return to work.  Boddie Decl. ¶ 5.  Mr. Siddique submitted a handwritten letter suggesting that he change from a full-time position to a part-time position in Men's Suits, working in the evenings so that he could "be on time by catching train early forty five minute [sic] from my schedule."  Pl. Opp., Ex. 4 (Decision-Making Leave letter) [Dkt. 28-1].

At this point there is disagreement as to what Macy's offered to Mr. Siddique. Macy's says it offered him a choice of two part-time positions.  The first was a commissioned sales position in Ladies' Shoes, which Macy's states has a commission rate of 11%, compared to the 7.8% commission rate in Men's Suits.  The second position was an hourly sales associate position in Domestics at his average hourly rate of roughly $30/hour, despite the normal pay range in that department between $8.80 and $17.50/hour.  Younger Decl. ¶ 23.  Ms. Boddie remembers that Macy's told Mr. Siddique that there was no part-time position in Men's Suits and that the only open part-time positions were in Ladies Shoes and Domestics but "[t]here was no discussion about what the pay rate would be in either of those positions."  Boddie Decl. ¶ 5.  Mr.

5

Siddique disputes the rate at which Macy's claims it offered to pay him in either of the part-time positions Macy's offered him, but there is no dispute that Macy's offered two open part-time jobs to him. Resp. to SUF ¶ 27.[4]

Mr. Siddique declined both offers, understanding that "he would be resigning his employment with Macy's" and "he was not going to have a job." Boddie Decl. ¶¶ 6, 7. Ms. Boddie therefore declares that "Ekram Siddique was not fired from Macy's. Mr. Siddique voluntarily resigned his position." *Id.* ¶ 8. In response to a letter from Ms. Lucas informing Macy's of the Union's intent to file a grievance, Def. Mot., Ex. 1(F) (Lucas Letter) [Dkt. 23-7], Ms. Younger sent a letter on behalf of Macy's to the Union explaining the two offers of part-time employment and Mr. Siddique's response to each. Younger Letter ¶ 5. It would appear that no formal grievance was ever filed.

Mr. Siddique filed a complaint in D.C. Superior Court on September 7, 2010. On November 23, 2010, Macy's removed the case to this Court.[5] *See* Notice of Removal [Dkt. 1].

---

[4] The parties also dispute whether Macy's discriminated against Mr. Siddique by refusing to offer him a part-time position in Men's Suits, even though one soon became available. Mr. Siddique reports that Ms. Talia (Schedule Manager) told him on September 22, 2009, that "Macy's was looking to fill a[n] open Part-time position in Men's Suit[s] in my Department," Resp. to SUF ¶ 25, but Ms. Anninos told him during the meeting on that same date that there was no such position available. SUF ¶ 26. Mr. Siddique points to Macy's Supplemental Discovery Response to show that there was a job opening at the time and it was filled on October 5, 2009. Resp. to SUF ¶ 26. The Supplemental Discovery Response does not fully support his argument: It said, "At the time that Mr. Siddique was placed on Decision Making Leave and requested a part-time position in Men's Suits, *there was no such position available. After Mr. Siddique[] left his position at Macy's, a second night part-time position was added by the Scheduling group*. Elisa Correa . . . was hired on or about 10/05/09 with Elizabeth Green as her supervisor. Elisa resigned from her position at Macy's on or about 3/18/10." Pl. Opp., Ex. 13 (Macy's Supplemental Discovery Request) [Dkt. 28-1] (emphasis added).

[5] D.C. Code § 2-1403.16(a) provides a private right of action without filing charges with the D.C. Office of Human Rights, which right Mr. Siddique exercised when he filed his complaint in Superior Court. The complaint was removed here under this Court's diversity jurisdiction. *See* 28 U.S.C. § 1332.

From May 2011 until May 2012, the parties engaged in extensive discovery. During that time, the Court held four status conferences with the parties to manage discovery between Mr. Siddique, proceeding pro se, and Macy's. On May 7, 2012, Macy's filed a motion for summary judgment. The Court granted two motions by Mr. Siddique for an extension of time to respond, and he filed his opposition on July 25, 2012. On August 9, 2012, Macy's filed its reply.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.

## III.  ANALYSIS

Summary judgment is an effective and efficient way to resolve a case when there are no material facts in dispute. There are many facts relevant to this case that are not in dispute: Mr. Siddique acknowledges that his childcare responsibilities resulted in his late arrival to work on a frequent basis and that he was warned once orally and twice in written Reminders about his tardiness; he also acknowledges that he told a co-worker from Senegal that "we didn't

7

come from the jungle," although he disputes any racial intent or overtone; and he admits that he told his Union representative that he could not commit to arriving on time for a full-time position and voluntarily sought a part-time position as a sales associate in Men's Suits. Both parties agree that Mr. Siddique said that he needed to stay with his youngest son while his wife took the other children to school but Macy's did not permit him to arrive late for this purpose. Mr. Siddique admits that he rejected both of the part-time positions Macy's offered him even though he was warned by his Union representative that it would mean he would have no job.

Mr. Siddique raises four claims: (1) discrimination based on national origin in violation of the D.C. Human Rights Act (DCHRA), D.C. Code § 2-1401 *et seq.*, (2) discrimination based on family responsibilities in violation of the DCHRA, (3) discrimination in violation of the D.C. Family and Medical Leave Act (DCFMLA), D.C. Code. § 32-501 *et seq.*, and (4) retaliation for seeking reasonable accommodation in violation of the DCHRA and the DCFMLA. The Court will grant Macy's motion for summary judgment.

### A.  DCRHA

Mr. Siddique's first two claims allege violations of the DCHRA. The DCHRA makes it unlawful for an employer to discharge an individual "wholly or partially for a discriminatory reason" based upon, *inter alia*, "national origin" or "family responsibilities." D.C. Code § 2-1402.11(a)(1). The DCHRA is interpreted consistently with similar terms in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C. 1993) (explaining that the court looks to Title VII cases when construing the DCHRA). Courts use the three-part, burden-shifting test set forth by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), when considering discrimination claims under the DCHRA. *Wallace v. Eckert,*

*Seamans, Cherin & Mellott, LLC*, No. 10-CV-978, 2012 WL 5513156, at *8 (D.C. Nov. 15, 2012).

This test first requires a plaintiff to establish a prima facie case of discrimination by a preponderance of the evidence. *Id.* To establish a prima facie case of discriminatory discharge under the DCHRA, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position from which he was terminated; (3) he was terminated in spite of his qualifications for the position; and (4) a substantial factor for the termination was that he is a member of the protected class. *Id.* Once a plaintiff makes out a prima facie case, raising a rebuttable presumption of unlawful discrimination, the burden shifts to the defendant to rebut the presumption by articulating a "legitimate, nondiscriminatory reason" for its action. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant offers evidence "from which the trier of fact can conclude that its action was not motivated by a discriminatory reason," the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the defendant's proffered reason was a pretext to hide an unlawful discriminatory purpose. *Id.*

### 1. National Origin Discrimination (Count II)

Mr. Siddique alleges that he was unlawfully removed from his position due to discrimination based on his national origin.[6] Pl. Opp. [Dkt. 28] at 7. Mr. Siddique fails to make

---

[6] Mr. Siddique also alleges that Macy's discriminated against him based on his national origin by failing to transfer him to the Furniture Department in 2007. Compl. ¶ 100. The DCHRA requires that "[a] private cause of action . . . be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof." D.C. Code. § 2-1403.16(a). Mr. Siddique made his request to transfer in September or November of 2007, and Macy's informed him sometime thereafter that his request for transfer was not approved. Compl. ¶¶ 48-56. Mr. Siddique also reported to HR in 2007 that he believed he had been discriminated against on account of his national origin. *See* Def. Mot., Ex. 3 (Siddique Dep.) [Dkt. 23-12] at 14. Mr. Siddique did not initiate this lawsuit, however, until September 7, 2010—almost three years after the alleged discriminatory act. Mr. Siddique is thus time-barred from raising this claim.

out a prima facie case for discrimination on account of national origin because he has not established that a substantial factor for the termination was that he is a member of the protected class. In fact, Mr. Siddique has not presented *any* evidence from which a trier of fact could conclude that his separation from Macy's was the result of national origin discrimination. Mr. Siddique worked successfully at Hecht's and Macy's for years preceding his departure, and his proffered facts do not raise any inference that Macy's subjected him to national origin discrimination at any time. Summary judgment will be granted on Count II.

### 2. Family Responsibilities Discrimination (Count I)

Mr. Siddique also alleges that Macy's violated the DCHRA when it removed him from his position "primarily due to his duties to care for his son." Compl. ¶ 97. As an initial matter, the Court notes that Mr. Siddique insists that he informed Macy's that his child required his attendance in the morning because of a health condition,[7] and Macy's disagrees. This is a dispute of material fact that cannot be resolved on the papers, and the Court draws all inferences in Mr. Siddique's favor. *See Anderson*, 477 U.S. at 255. The question remains, however, whether a request to arrive late for work regularly because of a child's health condition is covered by the rubric of "family responsibilities" under the DCHRA.

Local courts in the District of Columbia tend to give broad and generous interpretations to the DCHRA. "The DCHRA was passed to 'underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the highest priority.'" *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000) (quoting *Dean v. District of Columbia*, 653 A.2d 307, 319 (D.C. 1995)). *Executive Sandwich*

---

[7] *See* Compl. ¶ 26 ("Siddique informed management that his son's medical problem thus requires additional attention from Siddique in the mornings.") & ¶ 27 ("Siddique specifically told management that his 2 year old had a 'medical behavioral problem.'").

held that a lessee could sue its landlord under the DCHRA for discriminatorily refusing to allow assignment of a lease to Koreans. In that case, the plaintiff "allege[d] a direct harm to its [own] pecuniary interests," even though it was not the target of discrimination. *Id.* at 730. This result derived from precedent in the D.C. Court of Appeals that "the DCHRA is a remedial civil rights statute that must be generously construed." *Id; see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 889 (D.C. 1998) (broadly construing DCHRA to allow suit against individual law firm partners).

The DCHRA does not have totally expansive limits, however. In dismissing a claim of wrongful discharge, *Wallace* noted with skepticism the plaintiff's allegation that she suffered retaliation after she refused to work on a weekend because it would have meant canceling her daughter's birthday party. *Id.* at 886 & n.24. *Evans v. United States*, 682 A.2d 644 (D.C. 1996), refused to extend the DCHRA to a complaint that peremptory jury challenges were based on age. *Id.* at 649 ("We hold that [the DCHRA] is not a prohibition on peremptory challenges based on age."). This Court could find no case, and the parties cite none, in which the D.C. Court of Appeals has addressed whether "family responsibilities" under the DCHRA would cover caring for a medically needy child while a parent takes siblings to school.

However, the District of Columbia has adopted its own Family and Medical Leave Act (DCFMLA). *See* D.C. Code § 32-501 *et seq.* As relevant, the DCFMLA requires employers to provide 16 weeks of unpaid time off during a 24-month period for an employee to care for a family member with a serious health condition. *See id.* § 32-502(a)(4). If an employee qualifies for such leave, it can be taken intermittently or on a reduced leave schedule when medically necessary for the family member with a serious health condition. *See id.* § 32-502(c). The District has also adopted a Parental Leave Act, allowing parents to take leave to

attend school-related events, such as concerts, plays, sporting events, and parent-teacher conferences. *See* D.C. Code § 32-1201 *et seq.* The fact that these laws specifically protect qualified parents with sick children and children with school activities, counsels against reading the DCHRA to cover the same situations.

It is ultimately not necessary to decide whether Mr. Siddique's childcare responsibilities would be deemed protected under the DCHRA by D.C. courts because the record does not support Mr. Siddique's allegation that he was *discriminated against* because of these responsibilities. Macy's offers two kinds of legitimate, nondiscriminatory reasons for the disciplinary action resulting in his departure. First, Mr. Siddique was repeatedly late for work; he received multiple warnings that his tardiness did not comply with Macy's expectations. Indeed, in the September 22, 2009 meeting, Mr. Siddique informed Macy's that he could not commit to arriving on time in the future in his current position. Mr. Siddique's statement during his altercation with his fellow sales associate constituted an additional nondiscriminatory reason for Macy's to evaluate his continued employment as a sales associate in Men's Suits. Second, Mr. Siddique rejected the two part-time positions that Macy's offered him. *See Luhrs v. Newday, LLC*, 326 F. Supp. 2d 30, 34 (D.D.C. 2004) ("In addition, Ms. Luhrs's rejection of S & H's revised work schedule provides the defendants with 'a legitimate non-discriminatory reason for the cessation of [her] employment.'"). Macy's offered Mr. Siddique a choice of a commission-pay part-time position in Ladies' Shoes or an hourly-pay part-time position in Domestics. Mr. Siddique declined both offers, understanding that "he would be resigning his employment with Macy's" and "he was not going to have a job." Boddie Decl. ¶¶ 6, 7. Mr. Siddique does not dispute the factual bases for these legitimate nondiscriminatory reasons.

Further, Mr. Siddique has not established that these reasons were mere pretext for discrimination due to his childcare responsibilities. Mr. Siddique has not provided sufficient evidence to conclude that Macy's provided other sales associates with flexible schedules for reasons not pertaining to family responsibilities but denied him his requested 15-minute grace period because of his childcare responsibilities. Although Mr. Siddique asserts that Macy's accommodated Mr. Pinto, he acknowledges that Ms. Anninos denies that she had knowledge of any such accommodation. Resp. to SUF ¶ 12. Additionally, Mr. Pinto actually came in over an hour *before* his scheduled start time and left early one day a week. *Id.* This accommodation is not the same as Mr. Siddique's frequent late arrivals with no plan or chance to improve on his timeliness. Macy's has offered legitimate nondiscriminatory reasons for Mr. Siddique's separation, and Mr. Siddique has failed to produce any evidence that these reasons were a pretext for discrimination. Summary judgment will be granted on Count I.

### B. Family and Medical Leave Act (Count III)

In Count III, Mr. Siddique asserts a violation of the DCFMLA arising from Macy's failure "to accommodate [his] needs to care for his child's medically diagnosed issue" and its termination of him because he was regularly late. Compl. ¶ 103. As explained above, the DCFMLA requires employers to provide 16 weeks of unpaid time off during a 24-month period for an employee to care for a family member with "a serious health condition." D.C. Code § 32-502(a)(4). When the necessity for leave is forseeable, the law requires the employee to "[p]rovide the employer with reasonable prior notice of the medical treatment or supervision." *Id.* § 32-502(g)(1). The DCFMLA prohibits any person from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise any right provided by the [DCFMLA]." *Id.* § 32-507(a). Further, the law makes it unlawful for an employer to discharge or discriminate

against any person because the person opposes any practice proscribed by the law. *Id.* § 32-507(b)(1).

Mr. Siddique's DCFMLA claim cannot survive summary judgment because he has failed to establish that his child's medical condition constitutes a "serious health condition" under the DCFMLA.[8] A "serious health condition" is defined by the DCFMLA as "a physical or mental illness, injury, or impairment that involves [either] [i]npatient care in a hospital, hospice, or residential health care facility[] or [c]ontinuing treatment or supervision at home by a health care provider or other competent individual." *Id.* § 32-501(9) (subsections omitted). Under the DCFMLA, "the existence of a 'serious health condition' depends on the nature of care that is required to treat the illness." *Chang*, 846 A.2d at 326-27. Mr. Siddique states only that his son has a "medical behavioral problem," Compl. ¶ 27, and that he is "hyperactive," Resp. to SUF ¶ 9, 12. He does not present any evidence that his son's condition involves inpatient care in a hospital or healthcare facility. He also does not present evidence which satisfies the regulatory definition for "continuing treatment" at home by a healthcare provider, which the District defines as including some period of "incapacity." 4 DCMR § 1605.3(a)-(d). "Incapacity" means "inability to work, attend school, or perform other regular daily activities due to the serious health condition, treatment of the serious health condition, or recovery from the serious health condition." *Id.* § 1605.2(c). Although Mr. Siddique offers some evidence that his son needs special attention, *see* Pl. Opp., Ex. 10 (Doctor's Evaluation Letter for Rayhan) [Dkt. 28-1], this

---

[8] Under the federal FMLA, "[i]t is the plaintiff's burden to establish that the leave of absence was caused by a 'serious health condition.'" *Lightfoot v. District of Columbia*, No. 04-1280, 2006 WL 54430, at *4 (D.D.C. Jan. 10, 2006)). The Court looks to the application of the federal FMLA here because "[c]ourts interpret the FMLA and the DCFMLA similarly." *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 143 (D.D.C. 2010). Further, "[t]he DCFMLA definition of 'serious health condition' is nearly identical to the FMLA definition of the same term." *Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 326 (D.C. 2004).

evidence does not establish that his son was not able to perform regular daily activities as a result of his hyperactivity. *See Perry v. Jaguar of Troy*, 353 F.3d 510, 515-16 (6th Cir. 2003) (holding that the appellant had not established that his son had a serious medical condition due to his hyperactivity because he failed to establish incapacity when he "point[ed] to no evidence to support [his] conclusory claim that [his son] could not perform regular daily activities"). Mr. Siddique has not presented facts sufficient for the Court to conclude that Mr. Siddique's son's medical condition meets the statutory definition of "serious medical condition." Thus, the DCFMLA does not cover his claim, and summary judgment will be entered on Count III.

### C. Retaliation

In Count IV, Mr. Siddique alleges that Macy's retaliated against him in violation of the DCHRA by removing him from his position "only after he sought reasonable accommodations" and opposed discrimination prohibited by the DCHRA.[9] Compl. ¶ 106. The DCHRA protects an employee from retaliation for engaging in conduct protected by the statute. *See* D.C. Code § 2-1402.61; D.C. Code § 32-507(b)(1). The same *McDonnell Douglas* framework that applies to DCHRA discrimination claims also applies to retaliation claims under the statute. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010). The elements for the prima facie case for a retaliation claim, however, are slightly different. To establish a prima facie case of retaliatory termination under the DCHRA, a plaintiff must demonstrate that: (1) the employee engaged in statutorily protected activity; (2) the employee suffered a materially adverse employment action by his employer; and (3) a causal connection existed between the

---

[9] Mr. Siddique also alleges that Macy's retaliated against him in violation of the DCFMLA. In light of its conclusion that Mr. Siddique failed to present enough evidence to establish that his request for accommodation is covered by the DCFMLA, Mr. Siddique's claim for DCFMLA retaliation also fails.

two.  *Id*.  To constitute a "materially adverse" action, the employee must show that the action "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).[10]  Once a plaintiff has made out a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the action.  *Gaujacq*, 601 F.3d at 577.  If the employer meets the burden, the Court then considers "whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation."  *Id*. (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).

       Mr. Siddique has not made out a prima facie case for retaliation under the DCHRA.  Mr. Siddique cites as bases for protected activity his report of discrimination in 2007 and his request for accommodation on account of his family responsibilities.  His report of discrimination in 2007 is too distant in time from his separation in 2009 to establish a causal connection between the protected activity and his separation.  *See Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (examining closeness in time of protected activity and adverse action to determine causal connection in a Title VII retaliation case); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 95 (D.D.C. 2007) (relying on temporal proximity to determine causal connection in a Title VII and DCHRA retaliation case).

---

[10] Although *Burlington Northern* concerned retaliation under Title VII, this Court analyzes Mr. Siddique's DCHRA claim of retaliation under the standard for "materially adverse" set forth in that case given that courts look to Title VII when interpreting the DCHRA.  *See Cole v. Boeing Co.*, 845 F. Supp. 2d 277, 286 n.3 (D.D.C. 2012) (explaining the court's reasoning in deciding to apply *Burlington Northern* to a DCHRA claim).

It is unlikely that the DCHRA extends its reach to Mr. Siddique's request for "accommodation" to care for his son.[11] Even if his request were protected, Mr. Siddique has not demonstrated that Macy's took a "materially adverse" action against him that would "dissuade a reasonable employee from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. Upon Mr. Siddique's request for a part-time position in Men's Suits, Macy's offered Mr. Siddique the two part-time, evening, positions—in Ladies's Shoes and Domestics. Although Mr. Siddique claims that a position in Men's Suits was available at the time of his separation, the evidence he offers establishes only that a position in Men's Suits became available after his separation from Macy's. *See* Macy's Supplemental Discovery Request. Ms. Broddie, who attended the Decision-Making Leave meeting with Mr. Siddique, states that she herself warned Mr. Siddique that if he rejected the part-time positions Macy's offered him, he would effectively be resigning from Macy's. She also states conclusively that Mr. Siddique resigned from Macy's—"[he] was not fired." Boddie Decl. ¶¶ 7 & 8. The Union's apparent decision not to grieve his separation is corroborative of the fact that Mr. Siddique resigned and was not terminated. Mr. Siddique's bare and conclusory statement that he was terminated does not create a material issue of fact. Macy's took no materially adverse action against Mr. Siddique to effect his separation from employment. Mr. Siddique has therefore failed to make out a prima facie case for retaliation under the DCHRA, and summary judgment on Count IV will be granted.

---

[11] The Court notes that the DCHRA "contains no explicit requirement that an employer accommodate an employee's working schedule so that the employee can discharge his or her 'family responsibilities.'" *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 799 A.2d 381 (D.C. 2002) (quoting *Simpson v. Dist. of Columbia Office of Human Rights*, 597 A.2d 392, 405 (D.C. 1991) (internal quotation marks omitted)).

## IV.  CONCLUSION

For the foregoing reasons, Macy's Motion for Summary Judgment [Dkt. 23] will be granted, and judgment will be entered in favor of Macy's.  A memorializing Order accompanies this Opinion.

Date:   Februrary 8, 2013                                         /s/
ROSEMARY M. COLLYER
United States District Judge